# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

**DENNIS LEWIS, et al.,**

    **Plaintiffs,**

    **v.**                                   **Case No. 05-C-1008**

**JOHN MICHAEL STRAKA, et al.,**

    **Defendants.**

## DECISION AND ORDER

### I. BACKGROUND

Plaintiffs brought this putative class action alleging that CIB Marine Bankshares, Inc. ("CIB"), a privately held bank holding company headquartered in Wisconsin, and individuals who hold or held leadership positions in the company (collectively "individual defendants" or "defendants") violated §§ 10(b) and 20(a) of the Securities and Exchange Act of 1934 ("the Act"), 15 U.S.C. §§ 78j(b) & 78t, and Rule 10b-5, 17 C.F.R. § 240.10b-5. Plaintiffs allege that they purchased shares of CIB stock between April 12, 1999 and April 12, 2004 (the "class period") in reliance on defendants' misrepresentations concerning the financial health of the company and incurred damages as a result. On October 12, 2006, I dismissed plaintiffs' § 10(b) claims against the individual defendants other than John Michael Straka ("Straka"), concluding that as to those defendants, plaintiffs failed to allege facts supporting the element of scienter. I allowed plaintiffs' § 10(b) claims against Straka and, by imputation, CIB to proceed. I also allowed plaintiffs' § 20(a) claims against the individual defendants to proceed under a "controlling person" theory of liability. Subsequently, the Supreme Court decided Tellabs, Inc. v. Makor Issues & Rights, Ltd., 127 S. Ct. 2499, 2509-10 (2007), which modified the requirement for pleading scienter in securities fraud cases. Pursuant to Fed. R. Civ. P.

12(c), defendants now move for judgment on the pleadings, and based on Tellabs ask me to reconsider whether plaintiffs adequately pled scienter with respect to Straka.

## II. APPLICABLE LEGAL STANDARDS

I address defendants' motion under the Fed. R. Civ. P. 12(b)(6) standard. Thomason v. Nachtrieb, 888 F.2d 1202, 1204 (7th Cir. 1989). Under this standard, the factual allegations in plaintiffs' complaint must give defendants notice of the claims against them and the grounds upon which the claims rest and must raise plaintiffs' right to relief above a speculative level. Bell Atl. Corp. v. Twombly, 127 S. Ct. 1955, 1965 (2007). In addition, the complaint must also satisfy the heightened pleading standards provided in § 78u-4(b).

Section 10(b) prohibits the "use . . . , in connection with the purchase or sale of any security . . . , of any manipulative or deceptive device or contrivance . . . ." Implementing § 10(b), Rule 10b-5 makes it unlawful:

> (a) To employ any device, scheme, or artifice to defraud,
>
> (b) To make any untrue statement of material fact or to omit to state a material fact necessary in order to make the statement made . . . not misleading, or
>
> (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

To plead a violation of these provisions, a plaintiff must allege facts supporting that defendants (1) made a false statement or omission (2) of material fact (3) with scienter (4) in connection with the purchase or sale of securities (5) upon which he justifiably relied and (6) that the false statement or omission proximately caused damages. Makor Issues & Rights, Ltd. v. Tellabs, Inc., 437 F.3d 588, 595 (7th Cir. 2006) (vacated and remanded on other grounds, 127 S. Ct. 2499 (2007)). Scienter involves a "mental state embracing an intent to

-2-

deceive, manipulate, or defraud." Ernst & Ernst v. Hochfelder, 425 U.S. 185, 194 n.12 (1976). Misstatements or omissions made recklessly are also made with scienter.

To plead scienter, a complaint must "state with particularity the facts giving rise to a strong inference that the defendant acted with the required state of mind." § 78u-4(b)(2). In Tellabs, the Supreme Court instructed courts how to determine whether allegations are adequate to give rise to such an inference. I accept plaintiffs' allegations as true and consider the complaint in its entirety as well as other sources that I would ordinarily review, such as documents attached to the complaint or those subject to judicial notice. Tellabs, 127 S. Ct. at 2509. I then ask whether the allegations taken collectively establish the "strong inference." Id. In doing so, I weigh plausible nonculpable inferences against inferences favoring plaintiffs' claim. Id. at 2509-10. The inference favoring plaintiffs' claims "need not be irrefutable, . . . of the 'smoking-gun' genre, or even the most plausible of competing inferences." Id. at 2510. Rather, plaintiffs' complaint survives if a "reasonable person would deem the inference of scienter cogent and at least as compelling as any plausible opposing inference one could draw from the facts alleged." Id.

### III. RELEVANT ALLEGATIONS

As is relevant to the issue of scienter, plaintiffs allege the following facts: CIB operates numerous bank and non-bank subsidiaries, mainly in the Midwest. During the relevant period, Straka was president and CEO of CIB, chairman or a director of every subsidiary and a member of every subsidiary's loan and audit committees. In these positions, he had access to accurate information and control over the contents of company disclosures.

In 1999, at Straka's direction, CIB shifted from a conservative growth strategy to an aggressive and riskier one. Straka stated that he wanted CIB to accumulate at least $5 billion in assets within five years. Thus, CIB gave up a growth strategy based on acquiring small and

conservatively run community banks and loaning money to small or medium sized businesses, in favor of one involving multi-million dollar loans to a small number of high risk borrowers, most of whom were involved in the volatile real estate, construction and hotel industries. At the same time, CIB failed to adjust its loan underwriting, loan approval and credit review processes to accommodate its shift in strategy.

During the next few years, the quality of CIB's loan portfolio deteriorated dramatically. Many of its large loans became nonperforming or delinquent. Further, the company failed to adjust its loan loss reserves to reflect the high number of problem loans and, instead of writing off bad loans, extended them or rolled them into new loans. Individual defendants attempted to "remedy" a large, nonperforming loan by purchasing the borrower's stock to obtain control of it. Additionally, affiliated banks were required to participate in the large and unsafe loan practices; customers who purchased CIB stock often received better terms on loans; and sometimes customers were required to purchase CIB stock as a condition of getting a loan. In 2001, a regulatory agency examined CIB's accounts and concluded that it had grown so quickly as to render its underwriting and credit review systems inadequate and that its loans had deteriorated. Straka, in 2001 and 2002, attempted to raise capital through private placement memoranda, in which he overstated CIB's income and the value of its performing assets and inaccurately represented that CIB maintained adequate loan loss reserves. In April 2002, Straka, in a statement to shareholders, misstated CIB's net income, ratio of nonperforming assets and adequacy of loan loss reserves.

In September 2002, an examination of CIB-Chicago revealed $200 million in undisclosed problem loans, deterioration in the quality of its loan portfolio and other problems. As a result, CIB-Chicago entered into an agreement with the FDIC and an Illinois regulator to remedy these deficiencies. Also in 2002, Straka wrote a letter to shareholders

misrepresenting the cause of a drop in net income and failing to mention the result of the CIB-Chicago examination. In 2003, in documents filed with the SEC and letters sent to shareholders, Straka minimized the number of nonperforming loans, falsely reported net income and book value, and failed to disclose that most of the large real estate and commercial loans, especially at CIB-Chicago, were delinquent or nonperforming. In 2004, CIB projected its 2003 losses to be about $150 million and its estimated nonperforming assets at about $200 million. It further reported that CIB and four of its subsidiaries received proposed Cease and Desist Orders from the FDIC to stop their unsound banking practices. It also disclosed that its 2001 and 2002 financial reports contained numerous material misstatements and likely needed to be restated. Also in 2004, in connection with the disclosure of CIB's financial problems, Straka retired.

During the relevant time period, Straka knew but did not disclose the volume of nonperforming loans, the inadequacy of loan loss reserves, the inefficiency of internal lending controls and safeguards, that CIB often extended rather than wrote off large nonperforming loans and other material facts. Straka also engaged in self-dealing, obtaining loans for himself and his family at favorable rates. Additionally, he signed SEC filings containing false statements and material omissions and made false statements and material omissions in letters to shareholders and private placement memoranda soliciting investors. Straka continually emphasized the growth and success of CIB's investment strategy, despite the ongoing deterioration of CIB's loan portfolio and the complete inadequacy of its internal controls. He did so because he wished to continue receiving his salary, bonuses and benefits and possibly to sell CIB or to take it public.

## IV. DISCUSSION

Taken as a whole, plaintiffs' factual allegations are sufficient to establish a strong inference of scienter on the part of Straka. Plaintiffs allege not just that Straka oversaw CIB on a global level but that he was involved with every CIB subsidiary. Cf. Higginbotham v. Baxter Intern., Inc., 495 F.3d 753, 757-58 (7th Cir. 2007). Further, plaintiffs allege not only that Straka was the chairman and/or a director of each CIB subsidiary but that he sat on the loan and audit committees of each subsidiary and thus at all relevant times likely had intimate knowledge of the loan and credit review issues of each subsidiary as well as its financial condition.

By participating in the work of the loan and audit committees of each bank in the CIB family, Straka had access to information concerning the quality and nature of the loan portfolio at each subsidiary. And while I cannot assume scienter based merely on a position within the company, Abrams v. Baker Hughes, Inc., 292 F.3d 424, 432 (5th Cir. 2002), "[o]ne of the classic fact patterns giving rise to a strong inference of scienter is that defendants published statements when they knew facts or had access to information suggesting that their public statements were materially inaccurate." Florida State Bd. of Admin. v. Green Tree Financial Corp., 270 F.3d 645, 665 (8th Cir. 2001).[1] Moreover, the sheer amount by which the income and assets of CIB had to be restated support an inference of scienter. See id. at 666. So too does the large dollar volume of undisclosed problem loans uncovered by the 2002 investigation, around $200 million. In combination with Straka's committee membership,

---

[1] Green Tree is a pre-Tellabs case; however, it cites to and reflects the Second Circuit's stringent standard for analyzing scienter, which arguably was the model for the "strong inference" standard established by Congress. See S. REP. No. 104-98, at 15 (1995), as reprinted in 1995 U.S.C.C.A.N. 679, 694 (noting also that while the committee did not intend to codify the Second Circuit's body of caselaw relating to scienter, it would be appropriate for courts to look to that body of law for guidance).

this volume strongly suggests that Straka knew the true financial status of the Chicago subsidiary.

Further, in private placement memoranda and other statements, Straka emphasized the health and the growth of CIB when in fact such health and growth was severely compromised by a nonperforming large-loan portfolio, inadequate loan loss reserves, inadequate policies addressing problem loans, and other deficiencies. Assuming, as I must, that the facts alleged in the complaint regarding the deterioration of the quality of the loan portfolio and the inadequacy of credit review procedures and loan loss reserves are true, it is difficult not to draw a strong inference that an individual involved at the subsidiary level, as Straka was, was aware of these problems. The inference is that Straka recklessly turned a blind eye to the financial health of the subsidiaries with which he was personally involved or that he had knowledge of the deterioration in the health of the company but, in order to buy time to fix the problem, opted not to initially disclose the truth. See Makor Issues & Rights, Ltd. v. Tellabs Inc., 513 F.3d 702, 710 (7th Cir. 2008) ("[Defendant] may have thought that there was a chance that the situation regarding the two key products would right itself. If so, the benefits of concealment might exceed the costs."). Such inference is at least as cogent and compelling as any plausible opposing inference, and therefore plaintiffs' complaint adequately alleges scienter.[2]

---

[2] Plaintiffs also filed a motion to lift the stay on discovery. However, since I am denying defendants' motion for judgment on the pleadings, I will also deny plaintiff's motion to lift the stay as moot.

-7-
Case 2:05-cv-01008-LA   Filed 03/03/08   Page 7 of 8   Document 245

## V. CONCLUSION

Therefore,

**IT IS ORDERED** that defendants' joint motion for judgment on the pleadings is **DENIED.**

Dated at Milwaukee, Wisconsin this 3 day of March, 2008.

/s
LYNN ADELMAN
District Judge